UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Steven McCorquodale,                          File No. 20-cv-518 (ECT/JFD)

             Plaintiff,

v.                                            **OPINION AND ORDER**

DG Retail, LLC, *d/b/a* Dollar General,

             Defendant.

---

Andrew D. Parker, Joseph A. Pull, and Christopher M. Daniels, Parker Daniels Kibort LLC, Minneapolis, MN, for Plaintiff Steven McCorquodale.

Andrew E. Tanick and Brent D. Kettelkamp, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Minneapolis, MN, for Defendant DG Retail, LLC.

---

Steven McCorquodale alleges that his former employer, Dollar General, denied him a promotion because of his age, then fired him because he complained about it. He asserts claims under the federal Age Discrimination in Employment Act and the Minnesota Human Rights Act. Dollar General seeks summary judgment and, failing that, to exclude the trial testimony of McCorquodale's damages expert. Dollar General's summary-judgment motion will be granted in part. On this record, no reasonable juror could find that Dollar General denied McCorquodale a promotion because of his age. A reasonable juror could find, however, that Dollar General fired McCorquodale because he complained about age discrimination. Dollar General's motion to exclude expert testimony

will be denied.  The issues Dollar General has identified with the expert's anticipated testimony do not justify exclusion.

I[1]

*Defendant DG Retail, LLC does business as Dollar General and operates a chain of retail stores under that name in twelve states.*  Am. Compl. ¶ 6 [ECF No. 41]; Answer ¶ 6 [ECF No. 42].  Relevant here, each Dollar General store is part of a "district."  Districts are grouped into a "region."  And regions are grouped into "divisions."  Droge Decl. ¶ 2 [ECF No. 71].  Consistent with this hierarchy, Dollar General "Store Managers report to District Managers, District Managers report to Regional Directors . . . , and Regional Directors report to Division Vice Presidents."  *Id.*

*In September 2014, Dollar General hired McCorquodale as a Store Manager.* McCorquodale Decl. ¶ 3 [ECF No. 81].  McCorquodale was 57 years old when he was hired.  McCorquodale Dep. 11 [ECF No. 80-1].  McCorquodale first managed a store in Maple Lake, Minnesota.  Dollar General later asked McCorquodale to transfer to a store in Mounds View, Minnesota, and he agreed.  McCorquodale Decl. ¶ 3.  McCorquodale aspired to be a District Manager, and Mike Schoonover, McCorquodale's Regional Director at the time, facilitated McCorquodale's transfer to Mounds View to aid in McCorquodale's development and help him achieve his goal of being promoted to District Manager.  *Id.*; McCorquodale Dep. 23.  McCorquodale "succeeded in cleaning the store, making it more presentable, and filling the shelves," and he would leave the Mounds View

---

[1]       Unless noted otherwise, these facts are either undisputed or construed in a light most favorable to McCorquodale.  Fed. R. Civ. P. 56(a).

2

store "in a better operating condition than it was [in] when he began there."  Schoonover Dep. 25 [ECF No. 75-1 at 63].

*In January 2016, Dollar General transferred McCorquodale to a store in Hilltop, Minnesota, where his claims arose.*  Wiszowaty Decl. ¶ 5 [ECF No. 74].  The Hilltop store was in a "tough neighborhood" and traditionally had "poor store conditions, . . . large amounts of merchandise in the receiving room needing to be unpacked and distributed onto the store shelves, and . . . large amounts of 'shrink,' which is merchandise unaccounted for, often as a result of theft."  McCorquodale Decl. ¶ 4; *see also* Borgerding Dep. 70 [ECF No. 80-1 at 250–72].  Schoonover recommended the transfer so McCorquodale could gain "more exposure to [] divisional leadership" and showcase his ability to succeed at a "complex" store.  Schoonover Dep. 25–26 [ECF No. 75-1 at 63–64].  During his time as the Hilltop Store Manager, Dollar General twice assigned McCorquodale to work as a "Temporary District Manager" while it sought to fill District Manager vacancies.  McCorquodale's first assignment lasted "a few weeks" in September 2016.  McCorquodale Dep. 30.  The second occurred in August 2017 and lasted "about four months."  McCorquodale Decl. ¶ 10.  McCorquodale resumed his Hilltop Store Manager role after each of these temporary assignments.  *Id.*

*McCorquodale performed reasonably well as Hilltop Store Manager and at least met Dollar General's job-performance expectations overall in 2016 and 2017.*  Dollar General periodically reviewed McCorquodale's performance.  For most of his employment, McCorquodale reported to District Manager Ron Borgerding.  *Id.* ¶ 8; Borgerding Decl. ¶¶ 1, 3 [ECF No. 72].  Borgerding reviewed McCorquodale's

3

performance as Store Manager at the end of 2016 and 2017.  For 2016, McCorquodale met or exceeded Dollar General's expectations in most areas, though he scored "below expectations" in shrink and in "total customer service," a metric derived from customer satisfaction surveys.  ECF No. 72-1 at 2–4; Wiszowaty Decl. ¶ 27.  Borgerding recognized that McCorquodale took over a "very complex location midway [through] the fiscal 2016 year" and scored him as having met expectations overall.  ECF No. 72-1 at 4.  For 2017, McCorquodale met or exceeded expectations in most areas, but scored below expectations in four categories: (1) "Key Carrier Turnover," which refers to "the turnover of employees who are entrusted to open and close stores"; (2) "OSAT," or "overall customer satisfaction"; (3) "Outs," or "merchandise that is out of stock"; and (4) "Receiving Room Dollars," or "stock that is back in a store's receiving room rather than out on the sales floor."  *Id.* at 6–9; Wiszowaty Decl. ¶ 27.  As in 2016, Borgerding scored McCorquodale as having met expectations overall in 2017, acknowledging that McCorquodale was not solely responsible for some below-expectations scores because he'd been assigned elsewhere (as a Temporary District Manager) for four months that year.  ECF No. 72-1 at 8.

*Dollar General periodically tracked McCorquodale's (and other employees') potential and readiness for a promotion.*  Dollar General scored employees as either "well-placed," "promotable," or "high potential."   "Well-placed" meant an employee had not shown potential for a promotion or needed more time to develop in that role; for a Store manager, "promotable" suggested potential for promotion to District Manager; and "high potential" meant the Store Manager had potential for promotion to Regional Director.

4

Droge Dep. 98–100 [ECF No. 80-1 at 274–94]. In February 2017, Borgerding classified McCorquodale as promotable and, in February 2018, scored him as high potential. In each case, McCorquodale's "readiness" was scored as "0-12 months." Borgerding Decl. ¶ 9; ECF No. 80-3 at 39–51, 68–69, 86.

*Because of a periodic reorganization at Dollar General, a planned meeting between McCorquodale and his then-Division Vice President to discuss McCorquodale's interest in a promotion did not occur.* Dollar General's Regional Directors have the "most input" in hiring or promoting District Managers, although a Division Vice President must give "final approval." Wiszowaty Decl. ¶ 11; Droge Decl. ¶ 3. The Regional Director also may seek input from a candidate's District Manager. *Id.* By 2017, McCorquodale had shared his interest in a promotion with his District Manager Ron Borgerding, his then-Regional Director Mike Schoonover, and his then-Division Vice President. Evidently with Schoonover's support, the Division Vice President intended to meet with McCorquodale to discuss the prospect of a promotion. The meeting never occurred, however, because that Division Vice President was reassigned as part of a periodic "realignment" process in February 2018. McCorquodale Dep. 84–87; Droge Decl. ¶ 4.

*The realignment put in place the cast of individuals who would take part in the decisions that are the subject of McCorquodale's claims in this case.* Realignment placed the Hilltop store in a new region. The store was assigned a new Regional Director, Dave Johnson, a new Division Vice President, Connie Droge, and a new Senior Talent Manager, Adam Wiszowaty. McCorquodale Decl. ¶ 13; Droge Decl. ¶ 4; Wiszowaty Decl. ¶ 10. The Hilltop store remained under District Manager Ron Borgerding. Borgerding Decl. ¶ 5.

5

*In response to an inquiry from new Regional Director Johnson, Borgerding identified McCorquodale as a candidate for promotion to District Manager.*   Johnson emailed District Managers in his new region, asking them to identify Store Managers who they considered to be "high potential" or "promotable" candidates for District Manager positions and who were willing to relocate.   ECF No. 72-1 at 11.   Borgerding identified McCorquodale as the only such candidate in his district.   *Id.*

*Check-in visits to the Hilltop store in March and April 2018 did not reflect well on McCorquodale.*   In March 2018, Division Vice President Connie Droge asked Senior Talent Manager Adam Wiszowaty to visit stores in the region and to report back on his observations.   Droge Decl. ¶ 6.   After visiting the Hilltop store, Wiszowaty reported that McCorquodale was "very disengaged and not happy about [Dollar General]."   ECF No. 74-1 at 42.   Wiszowaty added that the store's associates were "incredibly quiet and reluctant to talk—a direct reflection of [McCorquodale's] leadership."   *Id.*   In April, Droge, Johnson, and Borgerding visited the Hilltop store.   Droge found the store to be "dirty, messy, cluttered, and short of stock, with excess inventory . . . in the receiving area" and felt it "did not meet the standards [she] expected from stores in [her] division."   Droge Decl. ¶ 7.   All three were disappointed by the condition of the store, and, based on the visit, Borgerding expressed his view that McCorquodale "had potential to be a District Manager someday, but that he was not yet ready."   Borgerding Decl. ¶ 10; Droge Decl. ¶ 7; Johnson Dep. 94–96, 104 [ECF No. 75-1 at 81–123].

*On May 2, 2018, McCorquodale emailed Droge pressing his case for a promotion, prompting further consideration of the issue.*   McCorquodale wrote in part:

6

I can and have fixed several stores, but my skill set is toward teaching others how to do it. This was the plan when I hired on. I was on the fast track to [District Manager]. Unfortunately[,] with all the changes, it seemed that [District Managers] are now made through the buddy system. I was promised one from Mike [Schoonover], but instead he hired all externals for a year and now is gone. I was told I was not going anywhere until I found a person like me to take over Hilltop. Career killing when you do well.

I am not looking to re-prove myself over for the 3rd time while I see [Store Managers] from easy go lucky stores made [District Managers]. I have a lot of respect for this company and give a lot to it. I have been successful in everything I was given.

ECF No. 71-1 at 5. Droge replied, thanking McCorquodale for his contributions to Dollar General and copying Johnson so he would understand McCorquodale's "career aspirations." *Id.* at 4. Johnson followed up with an email to McCorquodale that explained Dollar General's process and criteria for promoting Store Managers to District Managers. *Id.* at 4–5. Separately, Johnson emailed Droge for permission to conduct a "TDC" exercise with McCorquodale, to which Droge responded, "Great idea DJ thank you!" *Id.* at 3.[2] Johnson quickly withdrew the request, however, after Borgerding told him that

---

[2] The TDC program was a "multi-day training workshop" that Dollar General used to "evaluate Store Managers for potential promotion to District Manager." Wiszowaty Decl. ¶ 6. "Completing the program was never a guarantee of a promotion, and poor performance . . . was a hurdle, but not insurmountable. . . . Store Managers who fared poorly in the TDC program could go through it a second time." *Id.*; *see also* Droge Decl. ¶¶ 10–11. McCorquodale attended the TDC program in July 2017. McCorquodale Decl. ¶ 9; ECF No. 74-1 at 48. During a "Change Management" exercise, he received scores of "good" and "needs improvement" across six performance categories and an overall rating of 3/5—or "good." ECF No. 74-1 at 30. In a "Customer Ready" exercise, McCorquodale received an overall rating of 2/5—or "needs improvement." *Id.* at 34.

McCorquodale had attended TDC training already and done "very poor[ly]." *Id.* at 2–3; Borgerding Decl. ¶ 11.

*In mid-May 2018, McCorquodale communicated with Johnson regarding his possible promotion to District Manager.* McCorquodale summarized his experience in the TDC program, touted his accomplishments as a Store Manager and Temporary District Manager, explained that a previous Division Vice President had "scheduled an interview" with him about a promotion before the realignment, and requested a second opportunity to participate in TDC training. ECF No. 74-1 at 48. McCorquodale also expressed frustration with Dollar General's failure to promote him. *Id.* Johnson asked Wiszowaty to contact McCorquodale's previous Senior Talent Manager, Bob Meyer, to "pull the results" from McCorquodale's TDC training. ECF No. 73-1 at 14. Meyer informed Wiszowaty that McCorquodale had "future potential" but "was not yet ready to become a District Manager" and had "mixed results" during his time as Temporary District Manager. Wiszowaty Decl. ¶¶ 10, 12; *see also* ECF No. 74-1 at 47. Johnson communicated to McCorquodale that he appreciated McCorquodale's contributions and understood his frustration at not being promoted. ECF No. 80-3 at 53. Johnson explained that, although McCorquodale completed TDC training in 2017, his observers had all left Dollar General, so Johnson did not "have much feedback on [his] results." *Id.* at 54. Johnson wrote that McCorquodale could "certainly . . . complete the new TDC exercise" but that "before we go down that path, we really need to see you execute" on five criteria:

> 1.  We like to see the [Store Manager] perform in the top 20% of the company in key metrics on our performance matrix or Green.

2. We have to see store operations run at a higher than average expectation on a consistent basis in all aspects. This is determined by the [District Manager] and [Regional Director] from announced and unannounced visits. There should be very few opportunities during visits and the [Store Manager] should be taking the initiative to execute around deliverables before the [District Manager] brings it to the attention of the [Store Manager].

3. The [District Manager] has to sign off on the [Store Manager] stating he or she feels the candidate is ready for the next step in becoming a [District Manager] for DG.

4. The [Regional Director] has to complete an assessment and store walk of the candidate to determine if he or she is ready for the next step in becoming a [District Manager].

5. TDC exercise presented to the HRD and [Division Vice President] after the [Regional Director] signs off on the candidate.

*Id.* at 53–54. These criteria, wrote Johnson, were what he sought from "any [Store Manager] who show[ed] interest in moving up to the next level of becoming a [District Manager]." *Id.* at 53.

*On May 25, 2018, McCorquodale lodged a complaint of age discrimination against Johnson with Dollar General's Employee Response Center (or "ERC").*[3] ECF No. 80-2 at 2–3; McCorquodale Decl. ¶ 14. McCorquodale reported that Johnson was "hiring extremely younger managers to be [District Manager] even though [McCorquodale] ha[d] tons of experience and training in the field." ECF No. 73-1 at 5. The ERC forwarded the

---

[3]   A third-party vendor runs Dollar General's ERC and receives and routes complaints "to the appropriate people at Dollar General based on the nature of the issue and the store location where the incident occurred." West Decl. ¶ 3 [ECF No. 73].

complaint to Wiszowaty and Employee Relations Manager Jeri West who, in her role, investigated internal complaints of discrimination and other workplace policy violations in the Hilltop store's region. *Id.*; West Decl. ¶¶ 1–2, 4. On May 27, Wiszowaty emailed West explaining that he was out of the office on parental leave, but that he was "familiar with what's been going on" and could "talk through this." ECF No. 80-2 at 23. West responded: "Have you talked to Steven? Any idea what he's referring to as 'discrimination' since there's no mention of a protected class in the ERC call?" ECF No. 80-2 at 23. Wiszowaty replied that "[a]ge is the only thing he could be referring to." *Id.* at 52. The next day, Wiszowaty forwarded West emails in which McCorquodale expressed frustration over not being promoted to District Manager, described his earlier visit to the Hilltop store— recounting that McCorquodale did not have the store "customer ready" and that his leadership was "not the best of the best"—and explained that Dollar General had promoted just one District Manager in McCorquodale's region since the start of the fiscal year, when Johnson took over. *Id.* at 22; ECF No. 71-1 at 7–10. On June 1, the ERC emailed West a second time, relaying that McCorquodale had requested an update on his complaint. ECF No. 80-2 at 6–7.

*On June 6, 2018, McCorquodale was involved in a physical altercation with a customer at the Hilltop store.* The incident deserves a detailed retelling. It began after a group of teenagers entered the store. McCorquodale observed two members of the group preparing to shoplift by emptying one container of balloons into another before checking out, intending to pay for only one container. McCorquodale Dep. 108–13. When McCorquodale confronted the two shoppers, they began "cussing and yelling" at him. *Id.*

10

at 109.  McCorquodale told the entire group they were being "no-trespassed" and escorted them out the store's front entrance.  The group remained nearby, however, and "continued to get more verbal," prompting McCorquodale to stand inside the front entrance of the store and call the police.  *Id.* at 112–13. The rest of the incident was captured on surveillance video.  As McCorquodale stood in the front entrance, one teenager from the group began to reenter the store.[4]  When she stepped through the doorway, McCorquodale stepped sideways, obstructing her path inside.  ECF No. 75-2 at 0:04–13.  The teen shoved McCorquodale, and he stumbled backwards.  McCorquodale regained his balance, remained in her path, and gestured for her to exit the store.  She pushed him backwards again.  *Id.* at 0:12–17.  McCorquodale regained his balance and took two steps towards the teen with his arms extended.  As he contacted her, she swung her fists wildly at McCorquodale and pushed him away once more.  *Id.* at 0:18–23.  The teen approached McCorquodale again and they exchanged words, but four others from the group reentered the store and guided her outside.  *Id.* at 0:23–46; McCorquodale Decl. ¶ 18.  As McCorquodale stood at the store entrance, door ajar, the teen charged at McCorquodale once more and began striking him; McCorquodale grabbed the teen by her neck or hair as she continued to swing at him, and a brief struggle ensued.  The group of teens and another shopper separated them, and another group member pushed McCorquodale, causing him to stumble backwards.  ECF No. 75-3 at 0:01–23.  The group exited the store and, after the

---

[4]     Although with the group, this person had not participated in the shoplifting attempt or boisterous behavior that prompted McCorquodale to no-trespass them.  McCorquodale Dep. 109.

police arrived, they left.  McCorquodale Decl. ¶ 19; McCorquodale Dep. 137–38.  One teenager was charged with misdemeanor assault.  ECF No. 75-1 at 139–42.  McCorquodale reported the June 6 incident through the ERC, and West was assigned to investigate.  West Decl. ¶ 10.

*On June 8, the ERC emailed West a third time about McCorquodale's discrimination complaint, prompting West to speak with McCorquodale.*  The ERC explained that McCorquodale had "called again to follow up" and asked West to call him "within 24 hours to address his concerns[.]"  ECF No. 73-1 at 4.  West obtained McCorquodale's TDC results and spoke with him later that day.  When she asked McCorquodale why he thought age factored in his not being promoted to District Manager, he said that Johnson had promoted younger and less experienced Store Managers.  *Id.* at 15; West Decl. ¶ 15.  McCorquodale added that, because of its location, the Hilltop store was harder to manage than others in the district.  McCorquodale Decl. ¶ 16; ECF No. 73-1 at 15.  According to McCorquodale, West told him it was "hard to believe Dave Johnson would use . . . age as a reason not to promote" McCorquodale because the two were close in age.  McCorquodale Decl. ¶ 16.  Later that day, West spoke with Droge about McCorquodale's complaint.  Droge informed West that, when she'd visited the Hilltop store, it was "not in good condition," and that she did not view McCorquodale as ready for a promotion to District Manager.  ECF No. 73-1 at 15–16; Droge Decl. ¶ 12.

*Also on June 8, West began investigating the June 6 incident.*  That day, she spoke with a Regional Director covering for Johnson (who was out on vacation) and they agreed Dollar General could "suspend [McCorquodale] if there's evidence that he used excessive

force" or did "more than [] defend[] himself."  ECF No. 73-1 at 9.  Aaron Tagwerker, a

District Manager covering for Borgerding (who also was out on vacation), visited the

Hilltop store to download surveillance video of the incident, elicited a short, written

statement from McCorquodale, and later sent West the video and his notes.  *Id.* at 10;

McCorquodale Decl. ¶ 21.  West shared Tagwerker's comments in an email thread that

included Borgerding, Wiszowaty, and Johnson: "Some of the video is hard to make out.

However, it shows [McCorquodale] didn't deescalate the matter—[h]e could have walked

away.  It appears he may have antagonized the customer some.  He was defending himself

at times."  ECF No. 73-1 at 10–11; West Decl. ¶ 17.  West concluded that McCorquodale

violated Dollar General's "Workplace Violence Policy by blocking the store's doorway,

engaging in an altercation with a customer, intentionally putting his hands on her, and

following her as she left the store."  West Decl. ¶ 20; *see* ECF No. 80-3 at 155–56.  West

also concluded McCorquodale "violated Dollar General's Shoplifter Stops Policy[]

because[,] rather than walking away, he had put himself and others at risk and clearly

engaged with the customer, acting as the aggressor at times during the altercation."  West

Decl. ¶ 20.

   *On June 12, West recommended McCorquodale be fired.*  That day, West informed

Droge that she had reviewed the full surveillance video and believed McCorquodale's

"conduct warrant[ed] termination."  ECF No. 71-1 at 20.  West volunteered that "[g]iven

the allegations [McCorquodale] recently raised about DM Dave," she "did not want to

include him in the termination decision."  *Id.*  Apparently confused by West's mislabeling

of Johnson as a District Manager (when he as a Regional Director), Droge inquired which

region the store was in, and Wiszowaty clarified that the store was in Borgerding's district, where there was an "Age-ism allegation raised on DJ." *Id.*; Droge Decl. ¶ 15. Droge responded two minutes later: "Thank you Adam. Let's proceed with a term." ECF No. 80-2 at 38. West responded that she was "still in a meeting" and asked Wiszowaty to "please partner with [Borgerding] to proceed with the termination." *Id.* Later that afternoon, Wiszowaty informed West and Droge: "I have spoken with [Johnson] about this so he is fully aware of the recommendation to term. I have a voicemail out to [Borgerding] to talk through this. I will let you guys know when we have a planned day for [Borgerding] to be there to conduct the termination." *Id.* at 37. West responded that she had "just talked to [Borgerding] also" and that he planned to terminate McCorquodale the next day. *Id.*; Borgerding Dep. 203–04. Separately, Droge forwarded the email thread to Johnson, stating, "DJ heads up thanks." ECF No. 80-2 at 37.

*Meanwhile, also on June 12, West had resumed her investigation into McCorquodale's discrimination complaint by speaking with Borgerding and Johnson.* Borgerding explained that McCorquodale's previous Regional Director, Mike Schoonover, had promised him a promotion that never occurred. ECF No. 73-1 at 16. Borgerding shared that, in his view, McCorquodale "shouldn't have been sent to TDC in the first place" because he was not ready, and that although McCorquodale had decreased shrink at the Hilltop store, it was "not in good shape on a regular basis (cleanliness, recovery, etc.)." *Id.*; Borgerding Decl. ¶ 16. Johnson, meanwhile, denied that age factored in his decision not to consider McCorquodale and pointed out that he'd recently promoted a District Manager who he thought was "in her 60's." ECF No. 73-1 at 16. Johnson felt that

14

McCorquodale was "not ready" to be a District Manager and that "his store conditions" supported that conclusion. *Id.* That afternoon, West informed the ERC to "close" the ticket regarding McCorquodale's discrimination complaint. ECF No. 80-2 at 19.

*On June 13, Borgerding met McCorquodale at the Hilltop store and informed him he was being terminated.* McCorquodale ¶ 22; ECF No. 80-3 at 158. A "Personnel Action Form" noted the reasons for termination as violations of "company policy/procedure" and "Workplace Violence policy," adding that McCorquodale had "not deescalate[ed] an altercation and [used] excessive force toward a customer." ECF No. 80-3 at 160–61.

*On June 18, West informed McCorquodale that she had finished investigating his discrimination complaint and was "unable to substantiate it."* West Decl. ¶¶ 26–28; ECF No. 73-1 at 16. West added that his complaint "was handled as a separate investigation from the altercation he had [with] the customer that resulted in his [termination]." *Id.*

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citation omitted).

A

McCorquodale's discrimination claims under the ADEA and MHRA are generally "considered under the same analysis." *McKey v. U.S. Bank Nat'l Ass'n*, 978 F.3d 594, 598 (8th Cir. 2020) (citation omitted).  Under the ADEA, it is "unlawful for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  The MHRA makes it "an unfair employment practice for an employer, because of . . . age[,] to . . . discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment."  Minn. Stat. § 363A.08, subd. 2.

McCorquodale claims that age factored in Johnson's decision not to promote him in favor of a 29-year-old Store Manager, Nathan Lowey, but McCorquodale has not identified direct evidence of discrimination.  Therefore, his age-discrimination claims are considered under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *McKey*, 978 F.3d at 598.

At step one of *McDonnell Douglas*, McCorquodale must make a prima facie showing of age discrimination.  *Id.* at 598–99.  If McCorquodale establishes a prima facie case, then the burden shifts to Dollar General to articulate a "legitimate, nondiscriminatory reason" for its failure to promote him.  *Id.* at 599.  If Dollar General meets its burden, McCorquodale must show "by a preponderance of the evidence that the legitimate reasons offered by [Dollar General] were not its true reasons, but were a pretext for intentional discrimination." *Aulick v. Skybridge Americas, Inc.*, 860 F.3d 613, 620–21 (8th Cir. 2017)

(citation omitted); *accord Hoover v. Norwest Priv. Mortg. Banking*, 632 N.W.2d 534, 546 (Minn. 2001).

The parties agree, and the law is clear, that to establish a prima facie case of age discrimination on his failure-to-promote claims, McCorquodale "must show he: (1) was at least 40 years old; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was rejected for someone sufficiently younger to permit the inference of age discrimination." *Aulick*, 860 F.3d at 621.

Three of these elements are not in dispute. McCorquodale was over 40 at the time of the challenged action. He was not promoted to District Manager. And someone younger enough to support an inference of discrimination—29-year-old Nathan Lowey—was promoted over him in June 2018. *See* ECF No. 80-1 at 451–56.

Dollar General challenges only the second element, arguing that no reasonable juror could find that McCorquodale was qualified to become District Manager because he "had numerous poor store visits," performed poorly during his TDC training, "lacked engagement with his team," and because responsible decisionmakers all considered him unprepared. Mem. in Supp. at 18–19 [ECF No. 70].

Viewing the evidence in his favor, a reasonable juror could determine that McCorquodale was qualified for a promotion to District Manager. Borgerding scored McCorquodale as "meet[ing] expectations" in Store Manager performance reviews for 2016 and 2017. ECF No. 72-1 at 2–9. Twice, Dollar General selected McCorquodale to serve as a Temporary District Manager while it filled vacancies at the position. After McCorquodale's second assignment, which lasted four months, Borgerding thanked him

for his "leadership and hard work" and for "an outstanding 2017."  ECF No. 81-1 at 5.
Under McCorquodale's watch, Dollar General also selected the Hilltop store as a "regional
training store" in "recognition for upholding high business standards and excellent
customer service." *Id.* at 2; Borgerding Dep. 113.  This recognition meant McCorquodale
had done a "good job" and would train new store managers in the region.  Droge Dep. 102;
Borgerding Dep. 50.   And Borgerding characterized McCorquodale as "promotable"
within "0-12 months" in 2017 and as "high potential" within "0-12 months" in 2018.
Borgerding Decl. ¶ 9; ECF No. 80-3 at 39–51, 68–69, 86.  In January 2018, Borgerding
considered McCorquodale the only Store Manager in his district who was either
"promotable" or "high potential."  ECF No. 72-1 at 11–12.  There is evidence these ratings
meant McCorquodale "ha[d] the ability" to take on the role of District Manager.  Droge
Dep. 102.

That brings us to *McDonnell Douglas* step two.  "The burden to articulate a
nondiscriminatory justification is not onerous, and the explanation need not be
demonstrated by a preponderance of the evidence." *Torgerson v. City of Rochester*, 643
F.3d 1031, 1047 (8th Cir. 2011) (en banc) (citation omitted).

Here, Dollar General has met its burden to produce a legitimate, nondiscriminatory
reason for not promoting McCorquodale.  The evidence shows that those with input on
whether to promote McCorquodale all shared concerns that he was not prepared for a
District Manager role.   Johnson Dep. 104; Droge Decl. ¶ 8; Wiszowaty Decl. ¶ 12;
Schoonover Dep. 154 [ECF No. 75-1 at 79].   These concerns were informed by
McCorquodale's results in TDC training, where his feedback reflected need for

improvement in over half of the metrics on which he was scored during two exercises, ECF No. 74-1 at 29–38; Wiszowaty's negative report after visiting the Hilltop store in March 2018, *id.* at 40–42; and the disappointment Droge, Johnson, and Borgerding shared after visiting the Hilltop store in April 2018, Droge Decl. ¶¶ 7–10; Borgerding Decl. ¶ 10; Johnson Dep. 94–96. Johnson also informed McCorquodale that he had not met his own criteria to be considered for promotion. ECF No. 80-3 at 53–54; Johnson Dep. 145–148.

Thus, the burden falls back on McCorquodale to show pretext. At this stage, "the factual inquiry proceeds to a new level of specificity." *Rahlf v. Mo-Tech Corp., Inc.*, 642 F.3d 633, 638 (8th Cir. 2011) (citation omitted). "An employee's attempt to prove pretext requires more substantial evidence of discrimination than required to make a prima facie case because we view this evidence in light of the reasons articulated by the employer." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 611 (8th Cir. 2014) (en banc). To show discriminatory pretext, the employee must either "show that the employer's explanation is unworthy of credence because it has no basis in fact" or "persuad[e] the court that a prohibited reason more likely motivated the employer." *Aulick*, 860 F.3d at 621 (citing *Torgerson*, 643 F.3d at 1047). Examples of pretext evidence can include, but are not limited to, an employer's failure to follow its own policies, treatment of similarly situated employees in a disparate manner, and shifting explanations for its employment decision. *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012).

McCorquodale identifies four reasons why Dollar General's proffered reasons for not promoting him are pretext for age discrimination, but none creates a genuine dispute of material fact. *First*, McCorquodale argues for an inference of pretext because he was

19

"qualified" and "ready" for a promotion to District Manager.  Mem. in Opp'n at 36 [ECF No. 79].  "'[E]vidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination,' but it 'can be relevant when considering whether the record as a whole establishes a genuine issue of material fact.'"  *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 975 (8th Cir. 2012) (citation omitted); *accord Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1137–38 (8th Cir. 2006) ("While favorable performance reviews sometimes provide evidence of pretext, . . . receipt of positive reviews in the past, in and of itself, does not necessarily raise an inference of age discrimination.") (citation and quotations omitted).  This is particularly true when negative performance or other problems post-date a strong performance record.  *Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1013, 1018 (8th Cir. 2017); *Bernard v. St. Jude Med. S.C., Inc.*, 398 F. Supp. 3d 439, 463–64 (D. Minn. 2019).  "[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."  *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) (citation omitted).

That McCorquodale met the "qualified" element of his prima facie case and received some positive performance reviews does not show pretext.  Though McCorquodale received "meets-expectations" reviews for 2016 and 2017, and Dollar General anticipated his readiness for a promotion in "0-12 months," his reviews were indisputably a mixed bag.  For one, McCorquodale scored below expectations in some performance metrics during 2016 and 2017.  ECF No. 72-1 at 1–8.  And during the TDC

program—which was one way that Dollar General "evaluate[d] Store Managers for potential promotion to District Manager," Wiszowaty Decl. ¶ 6—McCorquodale scored almost evenly between "needs improvement" and "good"—or 2/5 and 3/5. ECF No. 74-1 at 30, 34. Johnson also testified that McCorquodale did not meet his own promotion criteria. Johnson Dep. 146–48. McCorquodale has neither offered evidence to rebut Johnson's testimony nor shown that Johnson applied his criteria disparately, and there is independent evidence that McCorquodale failed to meet Johnson's criteria by, for example, not garnering approval from Borgerding and Droge or impressing during store visits. Finally, it's significant that Johnson—the person McCorquodale says discriminated against him—was not assigned to McCorquodale's region until 2018. Johnson himself had not reviewed McCorquodale's performance favorably, and McCorquodale did not earn the feedback he relies on during the brief time that Johnson was his Regional Director. In sum, the evidence McCorquodale cites showing his performance was at times positive or satisfactory is not sufficient as a matter of law to show pretext. The opposite conclusion may be reached only by improperly second-guessing the wisdom of Dollar General's reasonable business judgments.

*Second*, McCorquodale argues that Johnson's promotion of a 29-year-old Store Manager, Nathan Lowey, instead of him shows pretext. Mem. in Opp'n at 36–37. To show pretext on this basis, McCorquodale must show that Lowey was "a *less* qualified applicant." *Torgerson*, 643 F.3d at 1049 (emphasis in original). If evidence "reveals that [McCorquodale] was only similarly qualified or not as qualified as [Lowey], then no inference of . . . discrimination would arise." *Id.* (citations omitted) (collecting cases);

21

*accord Cox v. First Nat'l Bank*, 792 F.3d 936, 939 (8th Cir. 2015); *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 916–17 (8th Cir. 2007).

Viewing the evidence in his favor, McCorquodale has shown at most that Lowey was similarly qualified, not that Lowey was less qualified. Johnson promoted Lowey in June 2018, after McCorquodale lodged his discrimination complaint. ECF No. 80-1 at 451, 455. Johnson selected Lowey from a pool of external applicants and internal applicants within his region. *Id.* at 456; Wiszowaty Decl. ¶ 24. In February 2017, when Borgerding scored McCorquodale as "promotable" within "0-12 months," Lowey was rated as "promotable" within "1-2 years." ECF No. 80-3 at 68–69, 86. The parties' submissions do not show whether Lowey completed TDC training or if there were written reviews of Lowey's performance between February 2017 and his June 2018 promotion. Without more, the slight disparity in "readiness" in February 2017—McCorquodale's "0-12 months" versus Lowey's "1-2 years"—does not show Lowey was less qualified in June 2018. This is true for at least five reasons: (1) Lowey, like McCorquodale, was considered "promotable" in 2017. The two were similarly qualified in this respect. (2) Lowey was promoted in June 2018, within his "1-2 years" readiness projection. In other words, Lowey's ratings do not suggest Dollar General fast-tracked him to a promotion. (3) Meanwhile, between February 2017 and Lowey's promotion, McCorquodale received negative feedback based on two store visits that occurred in March and April 2018. (4) Every Dollar General employee on record—Borgerding, Johnson, Droge, Wiszowaty, Schoonover, and Bob Meyer—believed McCorquodale was not ready for the role of District Manager. (5) There is no evidence those same Dollar General employees—or any

others—were similarly concerned over Lowey's readiness to be District Manager. Johnson's selection of Lowey over McCorquodale (and a pool of other applicants) does not show pretext.

*Third*, McCorquodale argues for an inference of pretext from Johnson's history of promoting Store Managers who are younger than McCorquodale, including some, he says, whose District Managers scored them lower than McCorquodale in "readiness" or who performed worse during TDC training. Mem. in Opp'n at 38–39. Whatever the relevance of this evidence,[5] it does not establish pretext. "The mere recitation of statistics . . . 'without some evidence tending to show that they indicate a meaningful phenomenon,' does not show discriminatory motive." *Noreen v. PharMerica Corp.*, 833 F.3d 988, 994 (8th Cir. 2016) (quoting *Albertson v. FMC Corp.*, 437 N.W.2d 113, 117 (Minn. Ct. App. 1989)). To support an inference of pretext based on Johnson's history of promoting District Managers, McCorquodale must, at the very least, provide demographic information about the pool of applicants Johnson selected from—such as their age and qualifications—that

---

[5]      At oral argument, McCorquodale confirmed his discrimination claims are tethered only to Johnson's decision to promote Lowey. McCorquodale does not, in other words, claim that Johnson passed him over when he promoted eleven other District Managers. *See also* Mem. in Opp'n at 33, 36, 39 (identifying Lowey as "the individual selected instead of [McCorquodale]"). This makes sense. Johnson promoted four of the twelve District Managers before he was assigned to McCorquodale's region and six when McCorquodale no longer worked at Dollar General. *See* ECF No. 80-1 at 454–55. Besides Lowey, Johnson promoted just one District Manager—58-year-old Debra Liermark—while overseeing McCorquodale's region. *Id.* at 451–55. If challenged, Johnson's decision to promote Liermark over a 61-year-old McCorquodale would not support an inference of age discrimination. *See Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153–54 (8th Cir. 2007) (five-year age gap could not support inference of age discrimination); *Hillesheim v. Wells Fargo Bank, N.A.*, No. 20-cv-0533 (WMW/HB), 2021 WL 4173167, at *4 (D. Minn. Sept. 14, 2021) (same).

puts his decisions in a meaningful light.  *See Grant v. City of Blytheville*, 841 F.3d 767,

776 (8th Cir. 2016); *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1146–47 (10th Cir. 2009)

("Without evidence regarding the number of male and female applicants, interviewees, and

the like, the employment statistic is nearly meaningless."); *Vardaman v. Wilkie*, No.

4:18CV00503 SWW, 2020 WL 1228717, at *5 (E.D. Ark. Mar. 12, 2020) ("Vardaman

reports that since 2010, the VA has approved thirteen physical therapists for promotion to

the GS-12 grade level, and only two of those promoted were male.  However, to constitute

meaningful evidence of pretext, Vardaman must come forward with evidence that the

females promoted by the VA during the relevant period were similarly situated to males

who sought and were denied a promotion.").

Here, McCorquodale has shown Johnson promoted District Managers who were

ages 24, 27, 29, 30, 31, 36, 37, 42, 43, 48, 58, and 65.  ECF No. 80-1 at 451–52.

McCorquodale has not, however, offered helpful evidence about the pool of applicants

from which Johnson chose these District Managers.  Most critically, McCorquodale has

not shown that when Johnson promoted any District Manager, he passed over an older

candidate, let alone one who was more qualified.  The mere possibility that Johnson, in

other instances, promoted younger candidates who were less or similarly qualified as

McCorquodale says nothing about whether Johnson discriminated by denying

McCorquodale a promotion in favor of Nathan Lowey.

*Fourth*, McCorquodale identifies "misrepresentations" he says Johnson made that

were "intended to conceal discrimination against McCorquodale."  Mem. in Opp'n at

39–41.  The first is an email in which Johnson explained to McCorquodale that the

24

promotion process would entail "several interviews" and that Droge was the "final deciding interview." ECF No. 80-3 at 60–61. McCorquodale contrasts this statement with testimony from (1) Droge, in which she disagreed that she was the "final deciding interview," but agreed that she, Johnson, and the human resources division "would make the final decision to put somebody on a bench to be considered as an option in the future if a district opened," Droge Dep. 87, 91–92; and (2) Wiszowaty, who testified that, although Droge had input, Johnson would have the final call on who filled a District Manager vacancy, Wiszowaty Dep. 21–22 [ECF No. 80-1 at 369–83]. These apparent inconsistencies are too removed from the age-discrimination question to permit a reasonable inference of discriminatory animus. We don't have, for example, evidence showing that Dollar General has given inconsistent reasons for the decision not to promote McCorquodale. *See Aulick*, 860 F.3d at 621–22 ("varying and contradictory statements" about who was responsible for firing plaintiff did not show pretext because there was "no substantial change in the *reason*" for the decision) (emphasis in original); *McKey*, 978 F.3d at 602. McCorquodale also highlights an email in which Johnson wrote that, after speaking with Borgerding, he'd learned McCorquodale's TDC results were "very poor." ECF No. 80-3 at 59–60. In McCorquodale's view, his TDC results were not "very poor," so this statement was false. Mem. in Opp'n at 40. Johnson appears to have written this statement, not after reviewing McCorquodale's TDC results, but after hearing about them from Borgerding. *See* ECF No. 80-3 at 59–60; Johnson Dep. 160. Johnson's description of McCorquodale's TDC results also followed an email in which he'd asked Droge for permission to "conduct a TDC exercise" with McCorquodale, diminishing any appearance

25

of bad faith. *See* ECF No. 80-3 at 59–60. In any case, Johnson's description of McCorquodale's TDC results—a roughly equal mix of 3/5 and 2/5 scores—is subjective and not the kind of mischaracterization that might support an inference of pretext. *See Nemec v. Wal-Mart Assocs., Inc.*, No. 14-cv-4450 (RHK/LIB), 2015 WL 8492040, at *8 (D. Minn. Dec. 10, 2015) (collecting cases).

To summarize, viewing the evidence and drawing all reasonable inferences in his favor, McCorquodale has not shown a genuine dispute that Dollar General's nondiscriminatory reasons for denying him a promotion were pretext. Dollar General's summary-judgment motion will be granted with respect to McCorquodale's ADEA and MHRA age-discrimination claims in Counts I and II of the Amended Complaint.[6]

B

McCorquodale alleges that, after he engaged in protected activity by complaining that Johnson denied him a promotion based on his age, Dollar General unlawfully retaliated by terminating his employment. McCorquodale asserts his retaliation claims under the ADEA and the MHRA. He does not claim to show direct evidence of retaliation, so his retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework.

To make out a prima facie case of retaliation under the ADEA or MHRA, a plaintiff "must establish the following elements: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the

---

[6]   In Counts V and VI of his Amended Complaint, McCorquodale also asserted claims for age discrimination stemming from Dollar General's decision to terminate him, but he now asks that those claims be dismissed. Mem. in Opp'n at 45. This request will be granted.

two." *McKey*, 978 F.3d at 601 (quoting *Bahr v. Cappella Univ.*, 788 N.W.2d 76, 81 (Minn. 2010)); *Stewart v. Ind. Sch. Dist. No. 196*, 481 F.3d 1034, 1042–43 (8th Cir. 2007).

Only the third element is in question here. Dollar General does not dispute that McCorquodale engaged in statutorily protected activity by lodging an internal age discrimination complaint or that his termination was an adverse employment action. Mem. in Supp. at 29. Dollar General argues that McCorquodale has not established a prima facie case of retaliation because there is no causal connection between his complaint and termination. In Dollar General's view, the lapse of time between the protected activity and termination decision—18 days, it says—combined with an intervening event—the June 6 incident—undermine any causal link. *Id.* McCorquodale counters that a trial-worthy causation question arises from the temporal proximity of Dollar General's decision to terminate him, references to his protected activity by decisionmakers in emails discussing the decision to terminate him, and various aspects of West's "sham" investigation into his complaint. Mem. in Opp'n at 17–22.

To establish a causal link under the ADEA, McCorquodale must show that his discrimination complaint was a "but-for cause" of his termination. *Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 919 (8th Cir. 2014). "Minnesota courts have not addressed . . . whether . . . but-for causation . . . similarly applies for reprisal claims under the MHRA." *Id.* "Although the Supreme Court of Minnesota has offered differing articulations of the causation element, the most recent is that causation can be proven 'by evidence of circumstances that justify an inference of retaliatory motive, such as a showing that the employer has actual or imputed knowledge of the protected activity and the adverse

27

employment action follows closely in time.'" *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 819 (8th Cir. 2017) (quoting *Dietrich v. Canadian Pac. Ltd.*, 536 N.W.2d 319, 327 (Minn. 1995)).   Under either standard, "only in cases where the temporary proximity is very close can the plaintiff rest on it exclusively." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011).   Thus, "more than a temporal connection between the protected conduct and the adverse employment action is [usually] required to present a genuine factual issue on retaliation." *Kiel*, 169 F.3d at 1136.   Further, "intervening unprotected conduct" may "erode[] any causal connection . . . suggested by . . . temporal proximity." *Id.*

McCorquodale has met his prima facie burden to show a causal connection under the ADEA and MHRA.   A reasonable juror could conclude that the temporal proximity between when responsible decisionmakers learned of his protected activity and their decision to terminate him shows retaliation.   McCorquodale lodged his complaint on May 25, and the ERC forwarded it to Jeri West on May 26.   ECF No. 73-1 at 5.   She recommended his termination 17 days later, on June 12.   ECF No. 80-2 at 38.   That day, Droge approved of West's recommendation, instructing West to "proceed with a term." *Id.*   Droge gave this instruction just four days after learning of McCorquodale's complaint, and minutes after being reminded that "McCorquodale had recently raised [allegations] about [Johnson]."   *Id.*; Droge Decl. ¶ 12.   Borgerding—who, Dollar General says, had authority to accept West's recommendation or disagree and escalate the decision to Droge—also agreed with West's termination recommendation on June 12, the same day he learned of McCorquodale's protected activity.   Borgerding Decl. ¶¶ 13–15; West Decl.

¶ 26.    In other words, responsible decisionmakers recommended or approved McCorquodale's termination 17 days after, 4 days after, or the same day as learning of McCorquodale's protected activity.   This type of proximity evidence can, on its own, satisfy the causal connection required at the prima facie stage.   *See, e.g.*, *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (13-day gap was "sufficient, but barely so to establish causation" on its own); *Kaufenberg v. Winkley Co.*, No. A14-1514, 2015 WL 3539744, at *7 (Minn. Ct. App. June 8, 2015) (employee fired "just over two weeks" after protected activity).[7]

Dollar General argues that McCorquodale's actions during the June 6 incident were intervening conduct that displaces any causal connection to be inferred from the temporal proximity of McCorquodale's complaint and his termination.   Mem. in Supp. at 29.   This

---

[7]    There is more.  Dollar General assigned West to investigate McCorquodale's age-discrimination complaint and the June 6 incident.  Although West says she conducted the investigations separately, a reasonable jury might view them as intertwined.  It appears, for example, that West first advised responsible decisionmakers of McCorquodale's discrimination complaint and discussed it with them at the same time she informed them of the June 6 incident.  ECF No. 73-1 at 9, 15 (first addressing both investigations with Droge on June 8); ECF No. 73-1 at 12, 16 (first addressing both investigations with Borgerding on June 12).  Decisionmakers referred to McCorquodale's protected activity in their investigation and review of the June 6 incident and as they determined discipline, including in emails resulting in Droge's instruction to terminate McCorquodale.  ECF No. 80-2 at 38.  Also, West limited her investigation into the June 6 incident by reviewing only the surveillance video and McCorquodale's short, hand-written statement.  She did not interview McCorquodale or any other employee present during the June 6 incident (there were at least two).  West Decl. ¶¶ 22–23.  In this respect, West seems to have strayed from the Dollar General employee handbook's "baseline guide" for "action items to consider" when investigating suspected violations of the workplace violence policy.  That guide recommends "obtain[ing] statements from all active employees with first-hand knowledge of the alleged policy violation."  ECF No. 74-1 at 79; *see also id.* at 74.  A reasonable juror could conclude that these facts support McCorquodale's retaliation claims.

argument challenges both McCorquodale's prima facie showing and his showing that Dollar General's proffered reason for his firing was pretext, so these two issues will be analyzed together.

There really isn't any question that Dollar General has met its burden to show a legitimate, nondiscriminatory reason for terminating McCorquodale.  Dollar General says that McCorquodale's actions during the June 6 incident violated its workplace violence and shoplifter policies.  West Dep. 77–78, 109–10; Borgerding Dep. 186; Droge Dep. 117–18; *see Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011) ("[V]iolations of company policy are legitimate, nondiscriminatory reasons for termination.").  McCorquodale therefore must "present evidence that (1) creates a question of fact as to whether [Dollar General's] reason was pretextual and (2) creates a reasonable inference that [Dollar General] acted in retaliation." *Gibson v. Concrete Equip. Co.*, 960 F.3d 1057, 1064 (8th Cir. 2020) (citation omitted).  "[T]iming alone is not enough to establish pretext, even if it can 'create an inference of retaliation' at step one." *Yearns v. Koss Constr. Co.*, 964 F.3d 671, 675 (8th Cir. 2020) (citation omitted).

McCorquodale has identified evidence that, viewed in his favor, creates a genuine fact dispute regarding whether Dollar's General's justification for firing him was pretextual and supports a reasonable inference of retaliation.  Most importantly, there is evidence that Dollar General did not discipline McCorquodale for similar conduct before he had engaged in protected activity.

One method of establishing pretext is "by showing that an employer . . . treated similarly-situated employees in a disparate manner." *E.E.O.C. v. Prod. Fabricators, Inc.*,

763 F.3d 963, 970 (8th Cir. 2014) (citation omitted).   "Whether the employees are 'similarly situated' is a rigorous test because the employees used for comparison must be 'similarly situated in all relevant respects.'   That is[,] they 'must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'"   *Id.* (internal citations omitted). "The comparators need not have committed the exact same offense but must have engaged in conduct 'of comparable seriousness.'"   *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (citation omitted).   In retaliation cases, a plaintiff may be his own comparator by showing an employer's disparate response to conduct of comparable seriousness before and after his protected activity.   *See Eliserio v. United Steelworkers of Am. Loc. 310*, 398 F.3d 1071, 1079–80 (8th Cir. 2005); *Henningsen v. City of Blue Earth*, 184 F. Supp. 3d 710, 719 (D. Minn. 2016).

Here, McCorquodale has submitted evidence that in April 2017, before he engaged in protected activity, he was involved in a similar altercation with a customer who he'd confronted for shoplifting.   The customer was charged with misdemeanor assault.   ECF No. 80-3 at 35–37.   A police officer's report of the incident shows this incident was similar to the June 6 incident:

> Steve stated that a male was in the store and he had asked if he needed help but he stated no.  Steve said that he was suspicious of the male so when the male walked towards the cash registers, Steve did as well.  Steve said that the male made a comment about how he was just watching him to make sure he wasn't stealing.  Steve said that the male started yelling and swearing.  Steve said that the male was talking bad towards the cashier.

Steve said that he eventually tried to get the male to leave the store. Steve had the video up in the office for me and showed it to me. **It showed the male refusing to leave. A scuffle appeared to happen between Steve and the male. The suspect punched Steve across the left side of his face. The female employee, Shannon Brown, attempted to get in between Steve and the male to try and get him out. Shannon and Steve both pushed the male out of the store and locked the door.** The male attempted to get back in but he couldn't so he walked away. While they were scuffling, an item fell out of his pocket that he was possibly attempting to steal.

*Id.* at 36. An ERC ticket and McCorquodale's testimony corroborate this version of events. *See* ECF No. 73-1 at 56 ("[McCorquodale] asked the suspect to leave but the suspect is resisting. They force the suspect to leave and closed the door."); McCorquodale Decl. ¶¶ 7–8. There is evidence, in other words, that on a previous occasion, McCorquodale told a customer to leave the store, the customer grew agitated and violent, and, rather than retreat, McCorquodale exerted physical force to remove the customer from the store. Dollar General neither investigated nor disciplined McCorquodale for this conduct.

Viewing the evidence in his favor, a reasonable jury could decide that McCorquodale's conduct in April 2017 was of equivalent seriousness to his conduct during the June 6 incident. A reasonable jury could also infer pretext from Dollar General's disparate response to similar conduct before his protected activity—conduct that likely violated its decisionmakers' proffered understanding of the workplace violence policy. *See* Borgerding Decl. ¶ 13 ("Dollar General employees are required to do anything they can to de-escalate any potentially violent situation, including retreating when that is the safest course."); Borgerding Dep. 16 (agreeing that "any employee who touches a customer, even if it is to protect themselves from being hit by a customer, will be terminated for having

violated the zero tolerance workplace violence policy"); West Decl. ¶¶ 20–21; Droge Decl. ¶ 13.

Dollar General argues that the April 2017 incident does not show pretext because "there is no evidence that the [ERC] forwarded any report" to Dollar General, so "neither Jeri West nor anyone else could have possibility investigated it." Mem. in Supp. at 31–32; Reply Mem. at 10. If this contention were true, and no decisionmaker involved in McCorquodale's termination was aware of the April 2017 incident, then Dollar General would have a point. *See Ebersole*, 758 F.3d at 925 ("When different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.") (citation omitted). But while Droge, Johnson, Wiszowaty, and West were unaware of the April 2017 incident, there is a common link: Ron Borgerding. The ERC sent Borgerding and other Dollar General employees an email about the April 2017 incident. ECF No. 73-1 at 57. Although the email did not describe what happened, McCorquodale attests that he spoke with Borgerding "about what had happened," and that Borgerding—his direct supervisor—told him he "would be fine as long as [he] had followed procedure and the police charged the customer." McCorquodale Decl. ¶ 8. Borgerding does not refute this testimony; he claims only to have "no recollection" of the April 2017 incident. Borgerding Decl. ¶ 20. Thus, a reasonable jury could find that Borgerding was aware of the April 2017 incident. A jury reasonably could infer pretext by contrasting Borgerding's swift termination approval in June 2018 with his inaction in April 2017.[8]

---

[8]   McCorquodale relies on another comparator incident, but it does not involve sufficiently comparable conduct to show pretext. In that case, a Dollar General associate

To summarize, a jury could reasonably determine that McCorquodale has shown a prima facie case of retaliation under the ADEA and MHRA and that Dollar General's stated reason for firing him was pretextual and created a reasonable inference that it acted in retaliation to his protected activity. Dollar General's motion for summary judgment will be denied as to Counts III and IV.

### III

Dollar General has also moved to exclude the testimony of McCorquodale's damages expert, Greta Bormann, under Rule 702 of the Federal Rules of Evidence. ECF No. 62. Bormann is a Certified Rehabilitation Counselor and Qualified Rehabilitation Consultant who has worked for ten years in the vocational rehabilitation industry. Bormann Decl. ¶¶ 1–2 [ECF No. 84]. She has prepared a report and will testify about the amount of McCorquodale's lost earnings and the reasonableness of his efforts to obtain employment after being terminated by Dollar General. *See* ECF No. 65-1 at 110–44.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

attacked a customer. An off-duty Assistant Store Manager, Maurice Carpenter, intervened to break up the fight. *See* ECF No. 80-2 at 71. Dollar General terminated the associate for violating its workplace violence policy, but it did not discipline Carpenter. Carpenter, McCorquodale says, is a comparator, and Dollar General's disparate treatment of him evidences pretext. Mem. in Opp'n at 25. Not so. Dollar General employees concluded that McCorquodale had antagonized a customer and acted as the "aggressor" at points during the June 6 incident. Carpenter, by contrast, was a bystander who intervened only briefly to break up a fight after punches were thrown. *See* ECF No. 80-2 at 60–71.

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). "District courts have wide latitude in determining whether an expert's testimony is reliable." *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007). So long as the expert evidence is reliable and relevant, "no single requirement for admissibility" governs. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation omitted). But the court should exclude an expert's opinion if it "is so fundamentally unsupported that it can offer no assistance to the jury." *Id.* at 929–30. The proponent bears the burden of showing, by a preponderance of the evidence, that expert testimony satisfies Rule 702. *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010) (citations omitted).

## A

Dollar General makes several arguments to exclude Bormann's testimony about McCorquodale's lost wages. It argues that Bormann is not qualified to offer such

testimony.  Daubert Mem. in Supp. at 18 [ECF No. 64].  Dollar General points out that Bormann "has no formal training in accounting" and does "not know whether her lost earnings calculations complied with generally accepted accounting principles."  Daubert Reply at 1–2 [ECF No. 85].  Further, Dollar General says, the tasks she performs as a vocational counselor "are markedly different from the lost earnings analysis she presented here."  *Id.* at 2.  McCorquodale has established Bormann's qualifications to opine on lost wages.  Bormann has earned a master's degree in vocational rehabilitation.  Bormann Dep. 23 [ECF No. 65-1 at 17].  Asked in her deposition what aspect of her studies "relate[s] to the mathematical or accounting task of calculating somebody's lost wages," Bormann explained that "[i]t's part of the labor market research of what occupations can and cannot provide, and then using just [] industry experience, commonsense."  Bormann Dep. 20–21 [ECF No. 65-1 at 14–15].  During her ten years as a Qualified Rehabilitation Consultant, Bormann has spent considerable time "evaluating the labor market, employee's [sic] incomes, loss of income and how to restore their income."  Bormann Dep. 141 [ECF No. 65-1 at 54].  An "essential function[]" of her job is calculating losses incurred over time by the unemployed and underemployed, including by "monitor[ing] their position to evaluate the potential to restore additional earnings."  Bormann Dep. 251–52 [ECF No. 83-1 at 30–31].  When helping injured workers restore wages, Bormann must "frequently . . . bear in mind [] the wages that they were earning at the time of their injury and do[] labor market analysis and research as to what types of occupations could earn them the same earnings, if not now, possibly in the future."  Bormann Dep. 20 [ECF No. 83-1 at 8].  She has also been a neutral third party in workers' compensation matters, where she "assess[es] earnings

36

over periods of time." Bormann Decl. ¶ 5. Finally, Bormann has authored "expert reports" related to" long-term disability claims," "loss of earning," and individuals' ability to "restore their wages." Bormann Dep. 147–48 [ECF No. 65-1 at 60–61]; Bormann Decl. ¶ 6. Together, the evidence shows that Bormann possesses "knowledge, skill, experience, training, or education" that will assist the trier of fact in determining McCorquodale's lost wages. *See, e.g.*, *Thomas v. Deloitte Consulting LP*, No. 3-02-CV-0343-M, 2004 WL 5499955, at *5 (N.D. Tex. Nov. 30, 2004).

Dollar General characterizes Bormann's lost wages testimony as "simple math" that would not help the jury. Daubert Mem. in Supp. at 19. This is not persuasive. "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006). "There is not . . . an implicit requirement in Fed. R. Evid. 702 for the proffered expert to make *complicated* mathematical calculations." *WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011) (emphasis in original). The "mere fact that [Bormann]'s contribution is to organize and add up the numbers provided to [her]" does not require the exclusion of her damages opinion. *Mint Solar, LLC v. Sam's W., Inc.*, NO. 5:19-CV-05167, 2021 WL 1776144, at *2 (W.D. Ark. May 4, 2021); *see also Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1086 (D. Minn. 2015) ("To the extent that portions of Herscovici's analysis constitutes basic addition or multiplication of the numbers he aggregated, the Court rejects Symantec's argument that such testimony would be inadmissible purely because it is a simple calculation."). That some jurors might possess the requisite knowledge to perform calculations forming part of Bormann's opinions is not

a basis to exclude them.  Bormann's opinions flow from "specialized knowledge" that will aid the trier of fact.

Pointing to alleged errors or deficiencies in her report, Dollar General argues that Bormann's lost wages testimony is unreliable.  Daubert Mem. in Supp. at 19–20; Daubert Reply at 5–7.  Dollar General points out, for example, that Bormann did not consider McCorquodale's mitigation of damages through employment he obtained after being terminated from Dollar General and calculated lost income for periods during which she accepts that McCorquodale was medically unable to work.  Two legal principles show that Bormann's omission of a mitigation analysis is not a basis to exclude her testimony.  First, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility."  *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (citation omitted).  Mitigation is a potential gap in Bormann's lost earnings opinion; its absence does not render her methods unreliable.  Second, as McCorquodale points out, it is Dollar General's burden to prove that he failed to mitigate his backpay damages.  *E.g.*, *Townsend v. Bayer Corp.*, 774 F.3d 446, 466 (8th Cir. 2014). Dollar General also argues that a mathematical error in Bormann's report shows her testimony will be unreliable.  Specifically, in calculating accrued backpay for the year 2021 through June 1, Bormann acknowledges she inadvertently used a six-month calculation— or half of McCorquodale's $48,844.00 salary—when she should have used just five months' pay.  Bormann Dep. 160. [ECF No. 83-1 at 18]; *see* ECF No. 65-1 at 128.  The error did not affect Bormann's total lost earnings calculation because she added just six months' backpay—not seven—for the rest of 2021.  In other words, her backpay

38

calculation for 2021 correctly encompasses twelve months' lost wages.  *See* ECF No. 65-1 at 128; Bormann Dep. 252–53 [ECF No. 83-1 at 31–32].  In any case, cross-examination, not exclusion, is the better option when a report like Bormann's includes an uncontested and on-the-whole harmless mistake.

Dollar General argues Bormann's methods of calculating front pay are flawed because she has not reduced those amounts to present value.  Daubert Mem. in Supp. at 20. This issue need not be addressed now.  For one, "front pay, including the determination of how much front pay to award, is an equitable issue for the court."  *Newhouse v. McCormick & Co.*, 110 F.3d 635, 643 (8th Cir. 1997).  Thus, Bormann's front pay testimony will not be admitted before a jury.  *Scott v. City of Sioux City*, 68 F. Supp. 3d 1022, 1042 (N.D. Iowa 2014).  Insofar as Dollar General seeks to exclude Bormann's front pay testimony from future court proceedings, that request will be denied.  *Daubert*'s application is "relaxed" in court trials.  *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012).  Courts have not required present-value reduction when future wage increases or inflation are not factored—the approach that Bormann appears to have taken here.  *See, e.g.*, *Prine v. Sioux City Cmty. Sch. Dist.*, 95 F. Supp. 2d 1005, 1015 (N.D. Iowa 2000).

Dollar General argues that Bormann's lost income testimony is "conjectural" because she relies on various assumptions: the age at which McCorquodale will retire, whether he will obtain future employment, whether he would have earned a promotion at Dollar General, and that his future salary would remain constant.  Daubert Mem. in Supp. at 20–21.  Most of these arguments, too, concern front pay testimony that will not be heard by a jury.  In any case, mere disagreement with an expert's assumptions is not a valid basis

to exclude under *Daubert*. *United States v. Brazile*, No. 4:18-cv-00056 SEP, 2020 WL 5534452, at *8 (E.D. Mo. Sept. 15, 2020) (collecting cases). Bormann appropriately, if not necessarily, made assumptions in calculating McCorquodale's lost wages. In some respects, Bormann has offered alternative calculations to the hypothetical outcomes that Dollar General challenges as conjectural. *See* ECF No. 65-1 at 128 (calculating lost income both if McCorquodale had "remained employed as a Store Manager" and if he was promoted to "District Manager at the time of his termination"). In any case, Dollar General may challenge the basis for these assumptions at trial through cross-examination and with competing evidence.

B

Next, Dollar General makes several arguments to exclude Bormann's opinion on the reasonableness of McCorquodale's job search efforts after he was terminated. Many of these arguments concern the underlying sources Bormann relies on in forming her opinions. For instance, Dollar General asserts that Bormann's testimony on the first eight months of McCorquodale's job search is not helpful because it is "based on what [he] told her"; that Bormann is not competent to testify about McCorquodale's inability to work during two periods due to a medical ailment because she merely "repeat[s] what [his] doctors said"; and that Bormann's reliance on public information renders unhelpful her testimony about McCorquodale's job search during the COVID-19 pandemic. Daubert Mem. in Supp. at 21–23. An expert may assume the accuracy of information provided by third parties in forming and offering an opinion; this reliance does not equate to evidence on the "proof of the accuracy of those representations." *Mint Solar, LLC*, 2021 WL

40

1776144, at *2.  It also "is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1033 (E.D. Mo. 2009) (quoting *Dura Auto Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)).  Vocational rehabilitation consultants specifically may "rely on medical records, reports, and testimony about a person's medical condition, combined with other materials and their knowledge and experience about the labor market, to opine on the effect the medical condition may have on that person's vocational outlook." *Masters v. City of Independence*, 998 F.3d 827, 838 (8th Cir. 2021).  Bormann's reliance on information she received from McCorquodale, his medical records, or public sources of information to which Dollar General objects (the Centers for Disease Control and Prevention and the Minnesota Department of Health) does not render her opinion about the reasonableness of McCorquodale's job search unreliable.  Bormann may apply her expertise developed over ten years as a qualified rehabilitation consultant to the facts she is given, and Dollar General may offer evidence to discredit the factual bases on which she relies.

Dollar General also argues that Bormann's testimony about the reasonableness of McCorquodale's job efforts during nine months when he was employed is "irrelevant" and "superfluous."  Daubert Mem. in Supp. at 22; Daubert Reply at 9–10.  Under Rule 401 of the Federal Rules of Evidence, "[e]vidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  The bar for relevance is low. *United States v. Holmes*, 751 F.3d 846, 851 (8th Cir. 2014).  Should McCorquodale establish Dollar

General's liability, evidence of his more recent employment will be relevant to ascertaining his lost wages.  If Bormann's testimony strays too far, Dollar General may object in real time at trial.

Finally, Dollar General argues that Bormann "clearly is not qualified to testify as to the reasonableness of [McCorquodale]'s job search after April 1, [2021,] because she did not address it in her report."  Daubert Mem. in Supp. at 22–23.  This argument—one that Dollar General seems to abandon in its reply brief—lacks merit.  In her report, Bormann offers opinions about obstacles that McCorquodale will face in obtaining future employment such as his age, time spent outside the workforce, and ability to explain his departure from Dollar General.  McCorquodale has shown that Bormann—by virtue of her work as a qualified rehabilitation consultant who helps the unemployed and underemployed restore their wages—is qualified to offer these opinions.

## C

Dollar General seeks to exclude Bormann's testimony about the labor market on essentially three grounds.  First, Dollar General asserts that testimony about the labor market is irrelevant because Bormann does not cite the availability of jobs as a hindrance to McCorquodale's job search efforts.  Daubert Mem. in Supp. at 23.  Bormann's proffered labor market testimony clears the low bar for relevance in several ways.  For just one example, Bormann considers the COVID-19 pandemic's impact on the labor market, concluding that "[e]ven if [] McCorquodale wasn't a high risk individual, the labor market at this time was depleted" and it "would have been extremely difficult for [him] to secure employment; especially within the retail industry due to so many stores being closed at the

time." ECF No. 65-1 at 129. If a jury disbelieves McCorquodale's evidence that health issues hindered his job search efforts, then the availability of obtainable jobs is obviously an important factor in whether McCorquodale mitigated his damages. If a jury accepts that McCorquodale's health played a role in his ability to obtain employment, Dollar General could challenge the reasonableness of his job search by asserting that jobs were available to him that did not risk exacerbating his health conditions. Bormann may testify on this issue. *See, e.g.*, Bormann Dep. 246–47 [ECF No. 83-1 at 27–28] (addressing the availability of remote jobs).

Dollar General also argues that Bormann's labor market opinions are unhelpful and unreliable because she cherry-picks "outdated publicly-available internet sites." Daubert Mem. in Supp. at 24; Daubert Reply at 11–13. "Under Federal Rule of Evidence 703, 'an expert may rely on otherwise inadmissible hearsay in forming [her] opinion if the facts and data upon which [she] relies are of a type reasonably relied upon by experts in the field.'" *Structural Polymer Grp., Ltd. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008) (citation omitted); *see, e.g.*, *Mint Solar, LLC*, 2021 WL 1776144, at *3. There is no rule barring an expert from relying on public sources, and Dollar General's cursory arguments on this question, including that Bormann should have relied on different sources, do not show that the materials she cites are not reliably used by those in her field. Bormann attests that "[t]he labor market and employment data included in [her] report . . . is the most recent data available, used in [her] field, . . . [and] appropriate for the given topics, based on [her] experience and training." Bormann Decl. ¶¶ 9–10.

## ORDER

Based on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Defendant DG Retail, LLC's Motion for Summary Judgment [ECF No. 68] is **GRANTED in part** and **DENIED in part** as follows:

      a.   The motion is granted as to Plaintiff Steven McCorquodale's age-discrimination claims.  Counts I, II, V, and VI of the Amended Complaint [ECF No. 41] are **DISMISSED** with prejudice.

      b.   The motion is denied as to McCorquodale's retaliation claims (Counts III and IV).

2.     DG Retail, LLC's Motion to Exclude Expert Testimony [ECF No. 62] is **DENIED**.


Dated:  March 11, 2022               s/Eric C. Tostrud
                                      Eric C. Tostrud
                                      United States District Court